EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

**MEER ENTERPRISES, LLC,**

                **Plaintiff,**

    - against -

**DURSON KOCAK, DURMESH KOCAK, SELINA KOCAK, NURI KOCAK, GONCO LLC, D/B/A UNIQUE CASTING HOUSE AND EMPIRE CASTING HOUSE, NURCO TECHNOLOGIES, INC., D/B/A NURCO CASTING, AND D.C. GROUP, INC.,**

                **Defendants.**

Index No.

Date Purchased:

<u>**SUMMONS**</u>

---

To:   DURSON KOCAK, DURMESH KOCAK, SELINA KOCAK, NURI KOCAK, GONCO LLC, D/B/A UNIQUE CASTING HOUSE AND EMPIRE CASTING HOUSE, NURCO TECHNOLOGIES, INC., D/B/A NURCO CASTING, AND D.C. GROUP, INC.,
33 West 47th Street
Second Floor
New York, NY 10036

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer on the Plaintiff's attorneys within 20 days after service of the summons,

exclusive of the day of service (or within 30 days after service is complete if this summons is not

personally delivered to you within the State of New York); and in the case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

complaint.

{00339332.DOCX; 1}

Dated:  New York, NY
          December 12, 2017

SADIS & GOLDBERG LLP

By:  Douglas R. Hirsch
      Ben Hutman
      551 Fifth Avenue, 21st Floor
      New York, New York 10176
      Telephone: (212) 947-3793
      Email: dhirsch@sglawyers.com

      *Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MEER ENTERPRISES, LLC

              **Plaintiff,**

  - against -

**DURSON KOCAK, DURMESH
KOCAK, SELINA KOCAK, NURI
KOCAK, GONCO LLC, D/B/A UNIQUE
CASTING HOUSE AND EMPIRE
CASTING HOUSE, NURCO
TECHNOLOGIES, INC., D/B/A NURCO
CASTING, AND D.C. GROUP, INC.,**

              **Defendants.**

Index No.

Date Purchased:

<u>COMPLAINT</u>

**AS AND FOR PLAINTIFF'S COMPLAINT,** in the above-captioned action, Plaintiff Meer Enterprises LLC, by and through its attorneys, SADIS & GOLDBERG LLP, alleges as follows:

<u>PRELIMINARY STATEMENT</u>

1.    This case arises from the purchase of the assets of a business and presents a straightforward breach of a covenant not to compete, the misappropriation of trade secrets, and the infringement of a valuable trademark in the jewelry business in New York's famed diamond district.

2.    In 2016, Plaintiff Meer Enterprises, LLC ("Plaintiff" or "Plaintiff") purchased most of the assets of a jewelry business operating under the trade name 'Unique Settings of New York' ("Unique Settings") from defendant D.C. Group Inc. ("DC"). As is common in such purchases, the shareholders of DC – Durson Kocak and Ekmel Ozan Anda - agreed not to compete with Plaintiff or hire its employees for three years. Despite this agreement — defendant

{00337590.DOCX; 1}

Durson Kocak, assisted by his brother, son, and daughter and the entities they control (collectively the "Defendants"), have begun competing with Plaintiff by operating a jewelry manufacturing and sales business, using the assumed name "Unique Casting House", and then soliciting Plaintiff's customers. In particular:

- Defendants began operating their business in the building next door to Plaintiff's showroom under the trade name "Unique Casting House", which was designed to cause confusion with Plaintiff's business operating under the trade name "Unique Settings".

- Defendants, using Plaintiff's customer lists, customer account information, and other confidential and trade secret information, have solicited and continue to solicit Plaintiff's customers, vendors and employees.

- Defendants have misrepresented to the trade that Durson Kocak may compete with Plaintiff and Defendant Durmesh Kocak has falsely advised at least one of Plaintiff's vendors that Plaintiff is on the "verge of bankruptcy".

- As a result of Defendants improper and tortious conduct, Plaintiff's showroom sales have declined and Plaintiff's goodwill is being harmed

3.      By their actions, Defendants have breached their agreements with Plaintiff, misappropriated Plaintiff's trade secrets, and infringed on Plaintiff's trademark of the Unique Settings name.  Plaintiff is entitled to preliminary and permanent injunctive relief to preserve the status quo and prevent any further harm to Plaintiff's business.

## PARTIES

4.      Plaintiff is a New York limited liability company with its principal place of business at 31-00 47th Avenue, 2d Floor, Long Island City, New York, 11101.  Plaintiff currently does business under the trade name Unique Settings of New York ("Unique Settings").

5.      Plaintiff also operates a showroom located at 31 West 47th St., New York, New York, 10036. The showroom sells jewelry and accepts orders for custom manufactured jewelry that is made by Plaintiff's manufacturing facility in Long Island City (the "Showroom Business").

{00337590.DOCX; 1}                                                 2

6.     Defendant Durson Kocak ("Durson") is a New Jersey resident and principal shareholder of D.C. Durson Kocak is also a member of Gonco LLC.

7.     Defendant Durmesh Kocak ("Durmesh") is a New Jersey resident and an officer of DC Group. Upon information and belief, Durmesh is a member of Gonco LLC.

8.     Defendant DC is a New York Corporation and upon information and belief, its principal place of business is in Queens, New York.

9.     Defendant Durson Kocak is an individual, who upon information and belief, resides in Cliffside Park, New Jersey.

10.     Defendant Selina Kocak is an individual, who upon information and belief, resides in Cliffside Park, New Jersey.

11.     Defendant Nuri Kocak is an individual, who, upon information and belief, resides in Cliffside Park, New Jersey.

12.     Defendant Nurco Technologies, Inc. d/b/a "Nurco Casting" is a New York corporation with its principal place of business at 33 West 47th Street.

13.     Defendant Gonco LLC ("Gonco") d/b/a "Unique Casting House" and d/b/a "Empire Casting House", is a New York LLC with its principal place of business at 33 West 47th Street.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the Defendants pursuant to CPLR §§ 301-302 because this action arises from Defendants' transaction of business in New York, because: (i) the Defendants have committed torts in New York; (ii) because the Defendants have committed torts outside New York causing harm within New York; and (iii) because Defendants have consented to the Jurisdiction of this court.

{00337590.DOCX; 1}

3

15.     Venue is proper in New York County pursuant to CPLR § 501.

## FACTUAL ALLEGATIONS

*DC Creates "Unique Settings"*

16.     For many years DC, operating under the "Unique Settings" trade name, was in the business of manufacturing jewelry for jewelers and retailers of all sizes for resale to their customers.  The Unique Settings trade name was, and is, widely known by jewelers throughout the United States.

17.     In 2004, DC Group filed "Unique Settings of New York" as a trademark with the United States Patent and Trademark Office ("USPTO"). The mark was registered on January 24, 2006 and its registration number is 3049228.

18.     Unique Settings was especially an especially well known trade name and mark in New York's Diamond District where it had a showroom at 31 West 47th Street, New York, New York.

19.     DC prospered for many years under the Unique Settings trade name and mark.  At its height, it employed more than 250 employees and boasted over 12,000 customers, including Blue Nile and Brilliant Earth.  DC's 31 West 47th Street showroom was used by DC to service primarily Diamond District customers.  Approximately $2 million of inventory was on hand for immediate purchase and custom orders were available on one day's notice.  Approximately 3,000 customers used the showroom, almost all of whom were located in the New York metropolitan area, with many from the Diamond District.  All of this business was conducted under the "Unique Settings" trade name and mark and all customers referred to the business as "Unique Settings." Indeed, across the entry of the 31 West 47th Street building is a large sign that says "Unique Settings."

{00337590.DOCX; 1}

4

20.     However, DC Group was not able to maintain its success and eventually encountered severe financial difficulties.  As of May 2016, DC was in millions of dollars of debt to its suppliers (precious metal and precious stone vendors), was struggling to meet payroll and unable to pay its rent.

***Plaintiff Buys The Majority of DC's Assets Including the Unique Settings Trade Name and Mark***

21.     On May 20, 2016, DC entered into an Asset Purchase Agreement ("APA") with Plaintiff.  Under the APA, Plaintiff paid DC $2 million dollars to purchase certain assets and assumed certain liabilities.  For example, DC sold Plaintiff assets, including but not limited to, the leases for DC's manufacturing facility and the 31 West 47th Street Showroom, various manufacturing equipment, the Unique Settings trade name,[1] the Unique Settings Trademark, Unique Settings' customer lists and account information, the point of sale system information as well as other proprietary and confidential business information, and the goodwill.

22.     Annexed as Exhibit A is the APA. Section 4.1 of the APA contains a "Covenant Not to Compete" (the "Non-Compete").  Pursuant to the Non-Compete, "Covered Persons"—consisting of DC, Durson Kocak and Ekmel Ozan Anda—agreed that they each would not:

> directly or indirectly, engage in the Business and shall not directly or indirectly, own, manage, operate, control, be employed by, be a consultant to, participate in or have a financial interest in, or be connected in any manner (including as an employee, consultant, officer, director, owner or lender) with the ownership, management, operation or conduct of any entity engaged in the same or similar Business for the Restricted Period (as defined below), as set forth in this Agreement, anywhere within the Business Territory (as defined below).

23.     Durson Kocak agreed to all of the terms of the APA pursuant to the Corporate Resolution To Sell, annexed as Exhibit B.

---

[1] Meer also purchased other "Unique" trade names, including Unique Wedding Bands, Unique Bracelet, Unique Chain, and Unique Diamond.

24.     The Restricted Period is defined in the APA as three years following the closing date and the Business Territory is defined as the continental United States.

25.     Section 4.1(a)(i) states that "each Covered Person shall not: divert, take away, solicit, or accept business from any Person which was a client, customer or account of" DC or its "Affiliates" during the 12 months immediately prior to the closing date.

26.     Section 4.1(a)(ii) states each Covered Person shall not "solicit, attempt to solicit, induce for employment, hire, employ, train or supervise any Person which then is or has been employed by Buyer or any of its Affiliates during the 12-month" prior to the Closing Date.

27.     Section 4.1(b) is entitled "Confidentiality" and requires each Covered Person to keep confidential non-public information about Plaintiff and its businesses and prohibits each Covered Person from using any such information "in any matter without prior written consent" of Plaintiff.

28.     The APA transaction closed on June 17, 2016.  On that same day, DC assigned the Unique Settings Trademark and trade name to Plaintiff.

29.     Since that time, Plaintiff has continuously operated under the Unique Settings tradename, used the Unique Settings manufacturing facility, and sold jewelry and taken manufacturing orders through the Unique Settings 31 West 47th Street showroom – the Showroom Business.

***The Kocaks Propose Buying the Unique Settings Showroom Business***

30.     On or about July 13, 2017, Durson and Durmesh Kocak ("the Kocaks"), met with Plaintiff and proposed buying the Unique Settings Showroom Business from Plaintiff.  The Kocaks proposed that they would operate the same jewelry manufacturing and sales business from the 31 West 47th Street Showroom and would sell to Plaintiff's Showroom Business

customers. Additionally, Plaintiff would be the preferred vendor to the Kocaks and would supply the finished product for sale in the Showroom.

31. The Plaintiff and the Kocaks agreed to the material terms of the Kocaks purchase of the Showroom Business. The purchase price was to be $2.45 million and the parties agreed to execute the agreement to purchase the Showroom Business and the preferred vendor agreement at a closing on September 29, 2017, at the offices of Sadis & Goldberg LLP.

32. In connection with closing the purchase of the Showroom Business, the Kocaks formed Gonco LLC to purchase the Showroom Business.

### Defendants Receive Plaintiff's Confidential Proprietary Business Information

33. During the negotiations and in the weeks prior to the closing date, the Kocaks requested confidential and proprietary information from Plaintiff regarding the Showroom Business. They represented that they needed this information to evaluate the purchase price of the business and perform due diligence. To facilitate the transaction, Plaintiff provided the Kocaks with confidential and proprietary information regarding the Showroom Business.

34. The confidential and proprietary information provided by Plaintiff to the Kocaks included, but was not limited to, sales reports, the customer list, customer account information, the amounts of product these customers purchased, and pricing.

35. This confidential and proprietary information was provided to the Kocaks in reliance upon an oral agreement on their part that they would maintain the confidentiality of the information and only use it in evaluating the Showroom Business.

36. The information was also provided to the Kocaks in reliance on the confidentiality provisions in the APA which bound the Covered Persons. The Kocaks are both Covered Persons under the APA.

37.    On September 18, 2017, in anticipation of the closing, the Kocaks requested that they be able to work from the Showroom for a week, in advance of the closing, so that they could smoothly transition the business.

38.    Plaintiff agreed, and the Kocaks worked in the Plaintiff's Showroom in the week prior to the proposed closing date. In addition, Selina Kocak worked that week in the Showroom and had access to all of Plaintiff's confidential information.   During this week the Kocaks advised many of Plaintiff's customers that they were coming back into the business and buying the Showroom Business.

39.    The Kocaks also advised numerous other customers of Plaintiff, and vendors in the jewelry trade, that they were re-entering the jewelry business by buying the Showroom Business.

40.    As a result, most of the Diamond District was put on notice that the Kocaks were back in the jewelry business, despite the Non-Compete.

### Defendants Back Out of the Purchase of the Showroom Business

41.    On September 29, 2017, the parties met at the offices of Sadis & Goldberg LLP to close the purchase of the Showroom Business by the Kocaks.

42.    However, at the closing, Durson Kocak advised that they would not be paying the agreed upon $2.45 million for the business. Rather, he advised that he would only pay $1.75 million.

43.    Plaintiff refused to re-negotiate the agreed upon purchase price for the Showroom Business and the parties left the closing without executing any documents.

44.    Plaintiff was very upset with the Kocaks, not simply because the Kocaks had backed out of a transaction they had agreed to, but also because Plaintiff had provided

Defendants with substantial confidential and proprietary information with the expectation that it would only be used to facilitate the Kocaks purchase of the Showroom Business.

45.     In mid-October, Plaintiff discovered that Defendants had opened a competing jewelry business at 33 West 47th Street, the building next door to Plaintiff's "Unique Settings" Showroom Business.

46.     The competing business was being operated from defendant Nurco Technologies, Inc.'s ("Nurco") booth at 33 West 47th Street.

47.     Nurco has been in the jewelry manufacturing and casting business for a number of years and is operated by Durson Kocak's brother – Nuri Kocak.

48.     Nurco and its owner, Nuri Kocak, are assisting the Kocaks in violating the APA by providing the Kocaks with premises, inventory, credit and other assets, to compete with Plaintiff.

49.     Upon information and belief, the Kocaks shared Plaintiff's confidential information and trade secrets with Nurco and Nuri Kocak and Nurco and Nuri Kocak are utilizing said confidential information and trade secrets.

50.     Nurco and Nuri are well aware of the terms of the APA and that their assistance is a violation of the terms of the APA.

51.     Nurco and Nuri are also well aware that they are not entitled to utilize any of Plaintiff's confidential information and trade secrets.

52.     So, not only had the Kocaks breached the Non-Compete, but they shared Plaintiff's confidential information with a competitor – Nurco - and were also infringing on Plaintiff's Unique Settings' trademark and trade name by operating their business under the trade name "Unique Casting House."

53. Finally, to compound the harm, Plaintiff discovered that the Kocaks, Nurco and Nuri, were soliciting Plaintiff's customers using the confidential customer information the Kocaks had received as part of the Showroom Business sale that was never closed due to the Kocaks last minute bad faith attempt to re-negotiate the purchase price.

54. Indeed, the following customers of Plaintiff have since been solicited by the Kocaks and /or Nurco and Nuri Kocak: Jewelry by M&S; Diamond Expo; E.C. Jewelry; Eli Adams Jewelers; J&J Zaidman; Ziv Trading; M. Tienfenbrunn; Ramin Gorjian; and Aviva's Design Corp.

55. Durmesh Kocak has also reached out to at least one employee of Plaintiff in an attempt to hire him to work at Gonco LLC d/b/a Unique Casting House.

56. Durmesh Kocak solicited Ye Myint Zaw and offered him a job with his new company – Gonco LLC d/b/a Unique Casting House. Ye Myint Zaw works in Plaintiff's CAD department, which is a critical design department and has access to Plaintiff's proprietary design information.

57. Plaintiff has also recently received mail at its Showroom address from American Express. The mail is addressed to "David Kocak" (Durson goes by the name David), at "Unique Casting House" -29 West 47th Street. The Showroom Business is located at buildings 29-31 West 47th Street.

58. TD Bank has also sent mail to Gonco LLC at Plaintiff's Showroom address.

59. American Express and TD Bank have confused Defendants' business—a business operating in violation of a clear Non-Compete—with Plaintiff's Showroom Business.

60. In addition, Plaintiff's customers and vendors are confused as a result of Defendants use of the "Unique Casting House" trade name and Defendants violation of the APA.

Indeed, much of the Diamond District was advised by the Kocaks that they were buying the Showroom Business. Plaintiff's customers have undoubtedly done business with Defendants based upon the misrepresentation that the Kocaks are allowed to operate a jewelry manufacturing business and the misrepresentation that they are somehow affiliated with "Unique" via use of the word "Unique" in the name of their business – "Unique Casting House".

61.     Durmesh Kocak also has also falsely advised at least one Plaintiff vendor that "Plaintiff is on the verge of bankruptcy and that he should get paid quickly and not extend credit".

62.     This statement is patently false and very damaging to Plaintiff's ability to do business with its vendors and customers. It was made by Durmesh with the intention of starting a false rumor to drive business away from Plaintiff and damage Plaintiff's goodwill.

63.     Defendants' new jewelry business is a clear-cut violation of the Non-Compete, infringes on the Unique Settings' trademark, and involves the misappropriation of Plaintiff's trade secrets and confidential information.

## CAUSES OF ACTION

**I.    BREACH OF CONTRACT AGAINST DURSON KOCAK, DURMESH KOCAK AND D.C.**

64.     Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

65.     Durson Kocak and DC are parties to the APA with Plaintiff. This agreement is valid and enforceable.

66.     Durson Kocak executed the D.C. Group Inc. Corporate Resolution to Sell, in which he agreed to personally be bound by all the provisions of the APA, including the Restrictive Covenants in Article IV.

{00337590.DOCX; 1}

11

67.     In Section 4.1 of the APA, Durson Kocak and DC are each a "Covered Person" and agreed not to engage, directly or indirectly, in the business of manufacturing, servicing, and distributing fine jewelry for a period of three (3) years from the closing date of June 20, 2016.

68.     In the same section, Durson Kocak and DC also agreed not to "divert, take away, solicit, or accept business" from Plaintiff's customers and not to attempt to hire any of Plaintiff's employees.

69.     Since mid-October, Durson Kocak and DC have breached these provisions of the APA by opening up a competing jewelry business next door to Plaintiff's Unique Settings.

70.     Durson Kocak and DC have further breached the APA by soliciting Plaintiff's customers and attempting to hire away at least of Plaintiff's employees.

71.     Durson Kocak has further breached the APA by utilizing confidential information in violation of Section 4.1(b) of the APA.

72.     Section 4.1(b) of the APA provides that "each Covered Person agrees to, and agrees to cause each of such Person's members, partners, equity holders, affiliates, directors, officers, employees, counsel, accountants, financial advisors, auditors, consultants and other representatives, to keep confidential any and all information or documents relating to Seller [DC] or any of its operations or business, and shall not disclose such information or documents to any Person or use such information or documents in any manner without the prior written consent of Buyer [Plaintiff].

73.     Durson Kocak breached these provisions by utilizing customer lists, pricing information, and other confidential information in connection with operating Unique Casting House.

74.    Durson also breached this provision by sharing such information with all the other Defendants.

75.    Durmesh Kocak was an officer of DC at the time of execution of the APA. By virtue of being an officer of DC, Durmesh Kocak was bound by Section 4.1(b) not to utilize any of DC's confidential information. Durmesh Kocak has utilized the confidential information and shared it with others, such as Nuri Kocak, in violation of the APA.

76.    As a result of these breaches of the APA, Plaintiff has suffered and will continue to suffer irreparable harm to its business and has suffered damages.

## II.    MISAPPROPRIATION OF CONFIDENTIAL INFORMATION AND TRADE SECRETS AGAINST ALL DEFENDANTS

77.    Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

78.    All Defendants have utilized Plaintiff's confidential information in connection with operating their jewelry manufacturing and sales businesses. They have utilized Plaintiff's customer lists, pricing information, and information regarding customer orders such as the amount of goods purchased and the types of goods purchased.

79.    All of the Defendants were aware that this information was Plaintiff's confidential information and that they were not entitled to utilize it. All of the Defendants were aware of the APA and the fact that Durson Kocak was prohibited from engaging in manufacture, sale and distribution of fine jewelry.

80.    In addition, Durson and Durmesh Kocak—as part of the negotiations leading up to a proposed purchase of the Showroom Business—agreed to keep confidential, and not to utilize, any and all information provided by Plaintiff in advance of that purchase, including sales

reports, the customer list, customer accounts and the amounts of product these customers purchased, and pricing.

81.     All of this information is confidential information and also qualifies as trade secrets. This information was kept confidential and only disclosed to persons who agreed to keep it confidential and not to utilize it unless they purchased the Showroom Business.

82.     Since at least mid-October, 2017, Defendants have breached these agreements by opening a nearby jewelry business and using the above confidential business information and trade secrets to solicit Plaintiff's customers, vendors, and employees and to compete with Plaintiff's Showroom Business.

83.     As a result of Defendants' misappropriation of the confidential information and trade secrets, Plaintiff has suffered and will continue to suffer irreparable harm and damage to its business.

## III.     <u>TORTIOUS INTERFERENCE WITH CONTRACT</u>

84.     Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

85.     All Defendants were aware of the APA and its restrictive covenants. The APA is a valid and binding contract between Plaintiff, DC and Durson Kocak.

86.     Defendants Durmesh Kocak, Nuri Kocak, Selina Kocak, Gonco LLC, and Nurco Technologies, Inc., all intentionally procured a breach of the APA by Durson Kocak and DC, without justification, so that they could illegally profit at the expense of Plaintiff and deny Plaintiff the benefit of its bargain.

87.     Specifically, all of the aforementioned defendants sought to profit from Durson Kocak engaging in the manufacture, sale and distribution of fine jewelry in violation of the APA.

They all worked with Durson Kocak to solicit customers, place orders, fill orders, and keep the books of Gonco LLC doing business as Unique Casting House. They also solicited, or helped Durson and Durmesh solicit Plaintiff's customers. Defendants Nuri Kocak and Nurco Technologies Inc. provided Durson, Durmesh, Selina and Gonco LLC with the physical space from which to engage in the illegal business.

88.   The aforementioned Defendants also knew that they were not allowed to utilize or disclose Plaintiff's customer lists, pricing information, customer account information, information regarding cost of goods, and other confidential and trade secret information.

89.   They all knew that this information was the property of Plaintiff and that the APA prohibited them from using or disclosing any of it. They used it to profit at Plaintiff's expense.

90.   None of the aforementioned Defendants conduct was justified and it was all undertaken to illegally enrich themselves.

91.   Their conduct has proximately caused Plaintiff to suffer damages, including, but not limited to, loss of sales, loss of goodwill and denial of Plaintiff's benefit of the bargain under the APA.

## IV.   COMMONLAW UNFAIR COMPETITION AND MISAPROPRIATION OF GOODWILL

92.   Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein

93.   The "Unique Settings" trade name and mark is a well-known trade name and mark in the New York Jewelry trade, as well as the national jewelry trade.

94.   The trade name and mark has significant goodwill attached to it. Plaintiff produces a high quality product under that trade name and mark and provides exceptional customer service and value.

95.     All of the Defendants have misappropriated that trade name and mark. The Defendants engaged in the jewelry manufacturing, sales and distribution business under the name "Unique Casting House".

96.     The Defendants called their business "Unique Casting House" in order to misappropriate and palm off of Plaintiff's trade name, mark and goodwill.

97.     By operating under the "Unique Casting House" name, the Defendants sought to have customers and vendors associate their business with Plaintiff's business. Indeed, defendants Durson and Durmesh Kocak advised customers in the Diamond District that they were purchasing the Showroom Business and would be filling their orders with Plaintiff. So, by calling their business Unique Casting House, they give customers and vendors the false impression that the Kocaks are filling orders with Plaintiff and have the financial backing of Plaintiff and that customers will get a high quality product.

98.     The Defendants unfair competition and misappropriation has caused damaged to Plaintiff's business and goodwill.

## V.    FEDERAL TRADEMARK INFRINGEMENT AGAINST ALL DEFENDANTS UNDER 15 U.S.C. § 1114

99.     Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

100.    The Unique Settings Trademark was filed with the USPTO on July 6, 2004 and registered on January 24, 2006.

101.    On June 17, 2016 the Unique Settings Trademark was assigned by DC Group to Plaintiff and the assignment was registered with the USPTO on July 8, 2016.

102.    Therefore, since at least July 8, 2016, the Trademark has been owned by Plaintiff.

103.    In mid-October, Defendants began operating a nearby competing jewelry business using the similar name and mark, "Unique Casting House".

104.    Defendants' use of Unique Casting House for their jewelry business in the building next door to "Unique Settings" is a deliberate and successful attempt to confuse customers, vendors, and lenders as to the origin, quality, and nature of Defendants' goods and business.

105.    Under the Lanham Act, a party that uses a registered trademark without the consent of the registrant is liable in a civil action to the plaintiff for (1) the disgorgement of defendant's profits, (2) damages sustained by the plaintiff, (3) injunctive relief, and (4) the costs of action.  15 U.S.C. §§ 1114, 1116, 1117.

106.    Where, as here, the use of the Trademark was intentional, the Plaintiff is entitled to treble damages of either the disgorged profits or the damages sustained by the Plaintiff, whichever is greater, and reasonable attorney fees under 15 U.S.C. § 1117(b).

107.    As a result of Defendants' Trademark infringement, Plaintiff has suffered and will continue to suffer irreparable harm to its business.

108.    Therefore, Plaintiff is entitled to an order enjoining Defendants from using the name Unique Casting or any name similar to Unique Settings and awarding Plaintiff treble damages, attorney fees, and costs in amounts to be determined at trial.

## VI.    <u>UNJUST ENRICHMENT</u>

109.    Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

110.    The Defendants were enriched at Plaintiff's expense by unfairly competing with Plaintiff, utilizing Plaintiff's confidential information, misappropriating Plaintiff's goodwill, and

denying Plaintiff the benefit of the bargain under the APA. All of this enriched the Defendants by allowing them to solicit and obtain business.

111.    It is against equity and good conscience to allow any of the Defendants to retain the benefit of their inequitable conduct and Plaintiff is entitled to damages.

## VII.    DEFAMATION AGAINST DURMESH KOCAK

112.    Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

113.    On or about October 19, 2017, Durmesh Kocak told Gabe Elias, Vice President of King Greek, that Unique "was on the verge of bankruptcy and that he should get paid quickly from Unique."

114.    King Greek does CAD work for Plaintiff and is an important vendor to Plaintiff.

115.    This statement is patently false. Durmesh made the statement in his attempt to unfairly compete with Plaintiff.

116.    The statement constitutes defamation per se.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands preliminary and permanent injunctive relief, disgorgement of profit, damages of at least $1 million dollars, and attorney fees, as well as any other relief the Court deems just and proper.

Dated:  New York, NY
        December 12, 2017

SADIS & GOLDBERG LLP

By:  Douglas R. Hirsch
     Ben Hutman
     551 Fifth Avenue, 21st Floor
     New York, New York 10176
     Telephone: (212) 947-3793
     Email: dhirsch@sglawyers.com

     *Attorneys for Plaintiff, Meer Enterprises
     LLC*

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("Agreement") is made and entered into as of this 20th day of May, 2016, by and among Meer Enterprises LLC, a New York limited liability company ("Buyer"), D.C. Group, Inc., a New York corporation (d/b/a Unique Settings of New York) ("Seller"), and Anda Ozan Ekmel ("Ekmel" or, in his capacity as the representative of Seller and the Stockholders, the "Representative").

WITNESSETH:

WHEREAS, Seller is engaged in the business of manufacturing, servicing and distributing fine jewelry ("Business");

WHEREAS, Ekmel and David Kocak (together with Ekmel, the "Stockholders") are the sole shareholders of Seller;

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, subject to the terms and conditions of this Agreement, all or substantially all of the assets of Seller, other than the Excluded Assets (as defined below);

WHEREAS, Buyer desires to assume from Seller, and Seller desires to assign to Buyer, subject to the terms and conditions of this Agreement, certain Assumed Liabilities (as defined below); and

NOW, THEREFORE, in consideration of the premises, mutual covenants and agreements contained herein, and for other good and valuable consideration, the parties hereby agree as follows:

## ARTICLE I

## SALE OF ASSETS

1.1     Assets To Be Sold.  On the basis of the representations and warranties herein contained and subject to the terms and conditions stated in this Agreement, on the Closing Date (as hereinafter defined), Seller shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall acquire from Seller, all right, title and interest of Seller in and to Seller's assets used in the Business (other than the Excluded Assets) (the "Acquired Assets").  The Acquired Assets include the following (except to the extent any of the following would constitute an Excluded Asset):

(a)     All tangible personal property (other than Inventory (as defined below)), including all furniture, fixtures, computer equipment, furnishings, leasehold improvements, equipment, facilities, machinery, vehicles, structures and any related capitalized items and other assets, including those assets enumerated and described in Schedule 1.1(a), as well as all manufacturer's warranties associated with such items.

(b)     All inventories (whether raw materials, packaging, supplies, work-in-progress, finished goods, spare parts, tools, fuel and other consumables) and deposits on inventory (collectively, "Inventory"), including those assets enumerated and described in Schedule 1.1(b).

(c)     All Accounts Receivable, including all vendor, dealers, customers and trade accounts receivable enumerated and described in Schedule 1.1(c).

{00302482.DOCX; 5}



(d)     All of Seller's rights under each of the Contracts identified on Schedule 1.1(d) (the "Assumed Contracts").

(e)     All Intellectual Property, and all transferrable authorizations issued by any Governmental Authority with respect to the operation of the Business, including the items listed on Schedule 1.1(e).

(f)     All computer software and data which is installed on computers owned by Seller, and all data that is hosted remotely.

(g)     All of Seller's intangible assets, including Seller's goodwill related to the Business.

(h)     All of Seller's prepaid assets, including all prepaid property taxes and expenses, and all surety bonds, surety deposits, security deposits and post office deposits posted by or on behalf of Seller in connection with the operations of the Business.

(i)     All business records of Seller of every kind including all advertising materials, customer lists, vendor and dealer lists, contractor and supplier lists, financial books and records, employee information, books, records, ledgers, billing records and files, accounts receivable records, files, documents, correspondence (including with customers and suppliers), drawings, specifications, creative materials (including artwork), advertising and promotional materials, studies, reports, and all other printed or written materials, including all of its historical materials relating to the Business.

(j)     All refunds and rebates owed to Seller relating to the Business.

(k)     All Claims, choses in action, rights of recovery, rights of set-off and rights of recoupment of Seller relating to the Business.

(l)     The names Unique Setting of NY, Unique Wedding Bands, Unique Bracelet, Unique Chain and Unique Diamond (such companies, the "Unique Companies").

(m)     All other assets used in the operation of the Business, including all of the Business's telephone numbers, fax numbers, post office boxes, domain addresses and e-mail addresses.

The conveyance, transfer, assignment and delivery of the Acquired Assets shall be made free and clear of all Liens except for Permitted Liens (as such terms are defined below), liabilities and obligations whatsoever, except for the Assumed Liabilities (as defined below). Seller shall be responsible for paying on or before Closing Date all expenses of transfer and assignment of the Acquired Assets.

1.2     Excluded Assets. There shall be excluded from the assets and properties to be sold, conveyed, transferred, assigned and delivered to Buyer under this Agreement the following assets related to the Business (the "Excluded Assets"):

(a)     All cash of Seller and all bank accounts of Seller.

(b)     All of Seller's employee benefit plans and programs.

(c)     All of Seller's insurance policies.

{00302482.DOCX; 5}

     (d)    Seller's corporate books and ledgers.

     (e)    Seller's tax returns and Claims for tax refunds.

    1.3    <u>No Assumption of Liabilities</u>. At Closing, Buyer shall assume only the liabilities and obligations arising after the Closing pursuant to the Assumed Contracts set forth on <u>Schedule 1.1(d)</u> and certain liabilities set forth on <u>Schedule 1.3</u> (the "<u>Assumed Liabilities</u>"). Other than the Assumed Liabilities, Buyer shall not assume or undertake to assume and shall have no responsibility for any other obligations or liabilities of Seller of any kind (the "<u>Excluded Liabilities</u>"). The Excluded Liabilities shall include: (1) any liability or obligation for any taxes, any liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments; (2) any amounts owing to the Unique Companies; (3) any liabilities relating to any litigation that relates to the operation of the Seller pre-Closing.

    1.4    <u>Purchase Price; Pay-Off Letters</u>. At the Closing, Buyer shall:

     (a)    deliver (or cause to be delivered) to Seller cash (the "<u>Purchase Price</u>"), by wire transfer of immediately available funds to an account or accounts designated in writing by Seller in an aggregate amount equal to:

     (i)    $2,000,000 (50% of which shall be paid at the Closing and the remainder upon the settlement or other resolution of the existing lawsuit against Seller (Case 15-CV-04441-FB-CLP, filed 07/29/15 in the United States District Court for the Eastern District of New York, PATRICO VIZUETTE, on behalf of himself, individually, and on behalf of all others similarly-situated, Plaintiff; against D.C. GROUP, INC. d/b/a UNIQUE SETTINGS OF NEW YORK, and OZAN EKMEL ANDA, an individual, Defendants), but net of amounts required to attain the settlement/resolution; for the avoidance of doubt, Seller shall indemnify Buyer against any losses or liabilities relating to such lawsuit, even those in excess of $1 million), allocable to goodwill; <u>plus</u>

     (ii)    the book value of the tangible assets as set forth on <u>Schedule 1.1(a)</u>; <u>minus</u>

     (iii)    the amounts to be paid to Seller's lenders pursuant to Section 1.4(b).

     (b)    pay (or cause to be paid) on behalf of Seller, all of Seller's secured indebtedness for borrowed money and Assumed Liabilities in accordance with the pay-off letters in form and substance reasonably satisfactory to Buyer executed by all lenders to Seller (the "<u>Pay-Off Letters</u>").

    1.5    [Intentionally Omitted]

    1.6    <u>The Closing</u>. The execution of the closing documents provided for in this Agreement (the "<u>Closing</u>" and the date on which such Closing occurs, the "<u>Closing Date</u>") shall take place in New York, New York promptly following the receipt of consent by the landlords of the assignment of the Existing Real Property Leases within 30 days of the date hereof. The Closing may be effectuated by the exchange of documents using facsimile or scanned signature pages electronically exchanged. The Closing shall be effective as of 12:01 a.m. eastern time on the Closing Date. Notwithstanding anything to the contrary contained herein, Buyer shall not be obligated to close the transaction unless such landlord consents are obtained, the Pay-Off Letters are obtained and Buyer is

{00302482.DOCX; 5}

satisfied with its due diligence investigation in its sole and absolute discretion. Subject to the prior sentence, the parties agree to use their reasonable best efforts to cause the Closing to occur as soon as practicable.

    1.7    Seller Deliverables. At the Closing, Seller shall execute and/or deliver (or cause to be executed and/or delivered) to Buyer:

    (a)    Certificates of title or separate instruments of sale, assignment or transfer in form suitable for filing and recording with the appropriate office or agency, for various items of the property where the same are necessary or desirable in order to vest or evidence title thereto in Buyer;

    (b)    All required consents (including all consents set forth in Section 1.1(d)) in form and substance reasonably satisfactory to Buyer to the assignment of any Contract or any other document or agreement to be assigned to Buyer pursuant to Section 1.1(d) of this Agreement which is not by its terms assignable without such consent. If Buyer elects to waive any such consent, then Section 1.10 shall nevertheless continue to apply;

    (c)    A certificate duly executed by Seller certifying that Seller is not a foreign person within the meaning of section 1445(f)(3) of the Code, which certificate shall set forth all information required by, and otherwise be executed in accordance with, Treasury Regulation section 1.1445-2(b)(2);

    (d)    Duly executed Pay-Off Letters; and

    (e)    Any other documents required to be delivered at Closing as provided in this Agreement or as reasonably requested by Buyer.

    1.8    Buyer Deliverables. At the Closing, subject to Buyer's independent verification of the balances and other amounts set forth in the Disclosure Schedules (as defined below) attached hereto, Buyer shall deliver the payments set forth in Section 1.4. For the avoidance of doubt, 50% of the payments required under Section 1.4(a)(i) shall be paid at the Closing and the remainder amounts due under Section 1.4(a)(i) shall be paid as described in such Section. All other payments due under Section 1.4(a) shall be paid at the Closing.

    1.9    Further Assurances; Cooperation. At any time following the date hereof and following the Closing, Seller and the Representative shall also execute and deliver without expense to Buyer such further instruments of conveyance, sale, assignment or transfer and shall take or cause to be taken such other or further actions as Buyer may reasonably request in order to vest, confirm or evidence in Buyer title to all or any part of the Acquired Assets, including amending any Disclosure Schedules. Seller and the Representative shall cooperate with Buyer as reasonably requested in connection with any tax audits of Buyer or its Affiliates relating to or involving the tax year in which the Closing occurs or any subsequent tax years.

    1.10    Nonassignable Assets.

    (a)    Notwithstanding any other provision of this Agreement, with respect to any Acquired Asset which by its terms or by any Law is not assignable or transferable without a consent or approval of any Governmental Authority or other third party (a "Nonassignable Asset"), such assignment and transfer shall not be made unless and until such consent or approval shall have been obtained or condition satisfied or Buyer shall have waived in writing the requirements of this Section 1.10.

{00302482.DOCX; 5}



(b)      Seller shall use its reasonable best efforts to promptly obtain any consent or approval required to assign or transfer a Nonassignable Asset to Buyer. All reasonable filing fees and payments to Persons required to obtain any such consent or approval, including any reasonable filing fees incurred in connection with the transfer or assignment of any permit, shall be borne by Seller.

(c)      Unless and until any such consent or approval that may be required is obtained or condition satisfied, to the extent permitted by applicable Law and by the terms of the applicable Nonassignable Asset, Seller and Buyer will cooperate and use commercially reasonable efforts to establish an arrangement reasonably satisfactory to Buyer under which Buyer would obtain the Claims, rights and benefits and assume the corresponding liabilities under such Nonassignable Asset (including by means of any subcontracting, sublicensing or subleasing arrangement) or under which Seller would enforce for the benefit of Buyer, in respect of such Nonassignable Asset, any and all Claims, rights and benefits of Seller against a third party thereto.

(d)      If and when the applicable consents or approvals, the absence of which caused the deferral of transfer of any Nonassignable Asset pursuant to this Section 1.10, are obtained, the transfer of the applicable Nonassignable Asset to Buyer shall automatically and without further action be effected in accordance with the terms of this Agreement.

1.11    Withholding Rights.  Buyer shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as Buyer is required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, local or foreign tax law.  To the extent that such amounts are so withheld by Buyer, such withheld and deducted amounts will be treated for all purposes of this Agreement as having been paid to Seller.

## ARTICLE II

### REPRESENTATIONS AND WARRANTIES
### OF SELLER AND THE REPRESENTATIVE

Seller and the Representative jointly and severally represent and warrant to Buyer as follows, except as specified in the applicable section of the Disclosure Schedule delivered herewith by the Seller (the "Disclosure Schedules"), which Disclosure Schedules shall be amended from time to time prior to the Closing:

2.1    Organization, Power and Authority.  Seller is duly organized, validly existing, and in good standing under the Laws of New York and has all necessary powers to own its properties and operate the Business as now owned and operated by it. Neither the ownership of its properties nor the nature of its business requires Seller to be qualified to do business as a foreign corporation in any other jurisdiction, except where the failure to be so qualified would not reasonably be expected to result in a material liability to Seller. Seller and the Representative have the legal capacity, full power and authority, as applicable, to enter into and perform this Agreement.

2.2    Authorization of Agreement.

(a)      This Agreement and the transactions contemplated hereby have been duly authorized by all corporate or shareholder actions necessary to authorize Seller and the Representative to enter into this Agreement and to enable Seller and the Representative to carry out its terms, and this Agreement is binding on Seller and the Representative and enforceable in accordance with its terms.

{00302482.DOCX; 5}

(b)      Neither the execution nor the delivery of this Agreement nor the consummation of the transactions contemplated hereby is an event which, of itself or with the giving of notice or passage of time or both, constitutes the violation of any provision of, or results in the breach of or accelerates or permits the acceleration of the performance required by the term of any license or any applicable Law of any Governmental Authority having jurisdiction, or any agreement, indenture, mortgage, Lien, security agreement or lease to which Seller and/or the Representative is a party, or by which Seller and/or the Representative may be bound, or of any judgment, decree, writ, injunction, order or award of any arbitration panel, court or Governmental Authority, applicable to Seller and/or the Representative, or results in the creation of any Lien upon any of the property or assets of Seller and/or the Representative, or terminates or cancels or results in the termination or cancellation of any such agreement, in each case, except where the violation, breach, acceleration, default, termination, cancellation, modification, failure to give notice or Lien, individually or in the aggregate, would not reasonably result in a material liability to Seller. No notice to or consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority or other Person is required by Seller with respect to Seller's execution or delivery of this Agreement or the consummation of the transactions contemplated hereby, except where the failure to give notice or obtain consent, approval or authorization, or make a designation, declaration or filing, individually or in the aggregate, would not reasonably be expected to result in a material liability to Seller.

2.3      Ownership.  The Stockholders are the owners, beneficially and of record, of all the issued and outstanding equity interests in Seller, free and clear of all options, warrants, rights of refusal, liens, mortgages, deeds of trust, security interests, encumbrances, restrictions, preemptive rights, Claims and charges ("Liens").  Seller has no subsidiaries.

2.4      Litigation; Product Liability.  Except as set forth on Schedule 2.4, there are no pending or, to the Knowledge of Seller, threatened actions before or by any Governmental Authority or by any other Person against Seller or relating to the Business.  Seller is not subject to any outstanding order that prohibits or otherwise restricts the ability of Seller to consummate fully the transactions contemplated hereby or to operate the Business. There are no pending, nor to the Knowledge of Seller are there any threatened, actions with respect to any breach of any express or implied product warranty or any product liability or other similar Claim (including Claims respecting damage to Persons or property) with respect to any product manufactured or sold by Seller, other than standard warranty obligations (to replace, repair or refund) made by Seller in the ordinary course of business.  There has been no product recall in the past two (2) years respecting any product sold or distributed by Seller.

2.5      Good Title.  Seller holds good and valid title to the Acquired Assets free and clear of all Liens except for Permitted Liens and no other Person has any ownership interest whatsoever (legal or equitable) in any of the Acquired Assets.  Seller has not signed any presently effective security agreement authorizing any secured party thereunder to file any mortgages, financing statements or similar documents that name Seller as debtor or that otherwise cover any of the Acquired Assets.  The execution, delivery and performance of this Agreement by Seller and the Representative (as applicable) will not result in the creation or imposition of any Lien on any of the Acquired Assets.

2.6      Condition of Assets.  All tangible assets included in the Acquired Assets, including all of the assets set forth on Schedule 1.1(a), are in good repair, working order and condition (subject to normal wear and tear), free from any known defects and are suitable and usable for the conduct of the Business in all material respects.

{00302482.DOCX; S}



2.7    Assets Used in Business; Infringement.

(a)    The Acquired Assets constitute all of the assets (real, intangible or personal), properties, licenses, rights and agreements which are used in the operation of the Business (other than the Excluded Assets) and include all assets, properties, licenses, rights and agreements sufficient to conduct the Business in substantially the same manner as currently conducted as of the date hereof and all such assets are included in the Acquired Assets. The Acquired Assets (other than the Excluded Assets) are all of the assets sufficient to permit Buyer and its Affiliates to conduct the Business substantially as conducted by Seller as of the Closing.

(b)    Seller owns or is licensed to use pursuant to a valid contract or otherwise has the exclusive right to use, practice, sell, license and dispose of, without restrictions, all copyrights, patents, trade secrets, trademarks, inventions, know-how, databases, customer lists, brand names, logos, designs, software, domain names, websites, social media accounts and any other intellectual proprietary rights (collectively, the "Intellectual Property") that are used or held for use in connection with the Business free and clear of any Liens except for Permitted Liens. Seller has taken all reasonably necessary actions to maintain and protect each item of Intellectual Property owned or licensed by Seller.

(c)    The conduct of the Business does not infringe or otherwise violate any Intellectual Property or other proprietary rights of any other Person, and there is no Claim pending or, to the Knowledge of Seller, threatened alleging any such infringement or violation or challenging Seller's rights in or to any Seller Intellectual Property and, to the Knowledge of Seller, there is no existing fact or circumstance that would be reasonably expected to give rise to any such Claim. To the Knowledge of Seller, no Person is infringing or otherwise violating, in any material respect, any Seller Intellectual Property owned by Seller or any rights of Seller in any Contract pursuant to which Seller uses any Intellectual Property in connection with the Business.

2.8    Financial Statements. Seller has delivered to Buyer reviewed balance sheets of Seller as of December 31, 2014 and December 31, 2015 and the reviewed balance sheet of Seller with respect to the Business as of March 31, 2016 and the related reviewed statements of income and cash flows for such fiscal years and the three (3) months then ended (the "Financial Statements"). The Financial Statements fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

2.9    Taxes. Seller and its predecessors have filed or will file with the appropriate Governmental Authorities, all federal, state and local tax returns material to the Business (including income, sales and use, property, and payroll tax returns and information returns) and reports required to be filed by Seller for all taxable periods ending on or before the Closing Date. Seller has paid or will pay all such taxes, related interest and penalties shown on such returns or otherwise assessed and levied, to the extent that such taxes have or will become due. There have been no federal or state audits or examinations by taxing authorities which have not been completed or are pending and Seller has not waived any statute of limitations for any tax year pursuant to the request of the Internal Revenue Service or any other taxing authority. There are no Liens for federal, state or local taxes upon any Acquired Assets and the Acquired Assets will be conveyed to Buyer free and clear of all such Liens except for Permitted Liens. Seller has withheld from its employees, independent contractors, creditors, stockholders and third parties and timely paid to the appropriate Governmental Authority proper and accurate amounts in all material respects for all periods ending on or before the Closing Date in compliance with all tax withholding and remitting provisions of applicable Laws.

{00302482.DOCX; 5}



2.10    Contracts and Commitments. Schedule 1.1(d) is a complete list, as of the date of this Agreement, with respect to (i) all of Seller's Contracts relating to the Acquired Assets and are material to the Business, including the Assumed Contracts, and (ii) all of Seller's Contracts relating to indebtedness (including guarantees). True and complete copies of the written Contracts so listed have been delivered or made available to Buyer prior to the execution of this Agreement. Seller has in all material respects performed all obligations required to be performed by it to date and is not in breach or default under any Contract included on Schedule 1.1(d). Seller has not been notified in writing by any party to any such Contract of that party's intention to terminate or materially amend the same. The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby, do not and will not require any consent or other approval by notice to, waiver from or other action by any Person under (with or without notice or lapse of time, or both), or give rise to any right of termination, amendment, modification, cancellation or acceleration of any right or obligation of Seller, or to a loss of any benefit to which Seller is entitled under, in any material respect, any provision of any Contract binding upon or held by Seller, or by which any of the Acquired Assets may be bound or affected, except where the failure to obtain consent, approval or waiver, or termination, amendment, modification, cancellation, acceleration or loss, individually or in the aggregate, would not have a material liability to Seller.

2.11    Affiliate Transactions. None of (i) Seller, (ii) any of its Affiliates, (iii) any officer or director of Seller, (iv) any Stockholder and (v) any immediate family member or Affiliate of any of the foregoing Persons is a party to or the beneficiary of (by trust or otherwise) any Contract with Seller or has any interest, directly or indirectly, in any of the Acquired Assets or any property used by Seller.

{00302482.DOCX; 5}



2.12    Leased Real Property. Seller does not own any real property. Schedule 2.12 sets forth a true, correct and complete list of all leases, subleases, licenses or other occupancy agreements under which Seller leases or otherwise occupies real property (each, as the same has been amended, an "Existing Real Property Lease") and the address and description of the real property granted under each Existing Real Property Lease (each, a "Leased Real Property"). Seller has delivered to Buyer true, correct and complete copies of all Existing Real Property Leases including all amendments, extensions, renewals, guaranties and other agreements material to each Leased Real Property. Neither Seller, nor, to the Knowledge of Seller, any other party to an Existing Real Property Lease is in default (with or without the lapse of time or the giving of notice, or both) or breach that would reasonably likely to result in a material liability to Seller. Seller has not received any written notice of the intention of any party to terminate or amend in any material respect any Existing Real Property Lease. Seller has a valid and subsisting leasehold estate in and the right to peaceful and undisturbed possession of the Leased Real Property for the full term of the respective Existing Real Property Lease.

2.13    Environmental Law. Seller and the Business are and have been in compliance with all applicable Environmental Laws in all material respects. Neither Seller nor the Business have been alleged to be in violation of, or liable under, any Environmental Law, nor have Seller or the Business ever been subject to any administrative or judicial proceeding pursuant to such Laws or regulations either now or at any time during the past two (2) years except for such violation, liability or proceeding that would not reasonably likely to result in a material liability. There has been no release of any Hazardous Materials at, on, under or from any property currently or formerly owned, leased or occupied by Seller or the Business except for the immaterial releases that would not reasonably likely to result in a material liability to Seller.

2.14    Employee Relations.

(a)    No Union. Seller's employees are not unionized. There is no labor strike, dispute, request for representation, slow down, or stoppage, pending or, to the Knowledge of Seller, threatened against Seller.

(b)    Employee Claims. Except as set forth on Schedule 2.4, no present or former employee of Seller has any Claim against Seller (whether under federal, state or local Law) under any employment agreement, or otherwise, including on account of or for (i) breach of contract, (ii) unlawful termination, (iii) overtime pay, other than overtime pay for the current payroll period, (iv) wages or salary for any period other than the current payroll period, (v) vacation or time off (or pay in lieu thereof), or (vi) any violation of any Law relating to minimum wages or maximum hours of work. Seller is in compliance with all applicable Laws in all material respects with respect to the employment of labor, employment practices and terms and conditions of employment, and wages and hours.

(c)    Discrimination, Occupational Safety and Other Laws. No Persons (including Governmental Authorities of any kind) have any Claim or, to the Knowledge of Seller, any basis for any action or proceeding, against Seller arising out of any Law relating to discrimination in employment or employment practices or occupational safety and health standards, including the Occupational Safety and Health Act and Title VII of the Civil Rights Act of 1964, or the Age Discrimination in Employment Act of 1967.

2.15    Compliance with Laws; Licenses.

(a)    Seller has complied in all material respects with, and is in present compliance with, all Laws applicable to its Business, properties and personnel. Seller has not received written notice from any applicable Governmental Authority of any alleged violation of any such Laws,

{00302482.DOCX; 5}

and to the Knowledge of Seller, there is no basis existing for a violation thereof which would reasonably likely to occur or be asserted in the future.

(b)　　Seller holds all material business licenses and business permits issued by Governmental Authorities with respect to the ownership or operation of the Business, all of such material license and permits are listed on Schedule 1.1(d). Seller holds all material licenses and permits sufficient to operate the Business currently conducted as of the date hereof.

2.16　　Employee Benefit Plans.

(a)　　Neither Buyer nor its Affiliates would reasonably likely to have any liability respecting any employee benefit plan of Seller or any of its Affiliates under ERISA.

(b)　　Each employee benefit plan of Seller has been established and administered in all material respects in accordance with its terms and the applicable provisions of ERISA, the Code and all other applicable Laws.

(c)　　Neither Seller nor any of its ERISA Affiliates has incurred any material liability in respect of post-employment health, medical or life insurance benefits for any current or former employees of Seller, except as may be required under the Consolidated Omnibus Budget Reconciliation Act of 1986, and at the expense of the employee or former employee.

2.17　　Brokers or Finders.　There are no, and will be no, Claims for brokerage commissions, finder's fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by Seller, the Stockholders or any of their respective Affiliates.

2.18　　No Bankruptcy Proceedings.　Seller is not bankrupt or insolvent and Seller is not a party to any current bankruptcy, insolvency or similar proceeding or, to the Knowledge of Seller, threated to be a party to any bankruptcy, insolvency or similar proceeding.

2.19　　Operation of the Business.　Since December 31, 2015, Seller has managed and operated the Acquired Assets and the Business in the ordinary course in all material respects.

2.20　　Inventory.　All Inventory on Schedule 1.1(b) has been sold in the ordinary course of business of Seller, is good and merchantable and readily saleable at prices customarily charged by Seller in the ordinary course of business consistent with past practices, and are free of any material defects.

2.21　　Accounts Receivable.　All of the outstanding accounts receivable shown on Schedule 1.1(c) represent, as of the respective dates thereof, valid accounts receivable arising from sales actually made or services actually performed, in each case, in the ordinary course of business consistent with past practice.　Seller has not canceled, or agreed to cancel, in whole or in part, any accounts receivable except in the ordinary course of business consistent with past practice.　Schedule 1.1(c) also sets forth (a) the top five (5) customers of the Company based on the annual revenues received by the Company for the year ended December 31, 2015 and (b) estimated reasonable allowance for bad debts for such Accounts Receivable (not to be less than 10% of all Accounts Receivable), in each case of (a) and (b) as of the date hereof.　Schedule 1.1(c) will be updated as of the Closing Date.

2.22　　Warranties.　Since January 1, 2013, to the Knowledge of Seller, all products sold or delivered by Seller have been in conformity, in all material respects, with all applicable contractual

{00302482.DOCX; 5}

10



commitments and all express and implied warranties. Since January 1, 2013, Seller has not made any warranties or provided for liability limitations that are inconsistent or in conflict with the terms of any Contracts with material suppliers. Since January 1, 2013, Seller has not been notified in writing of any Claims for, and, to the Knowledge of Seller, there are no threatened Claims for, any extraordinary product returns, warranty obligations or product services relating to Seller's products or services, and there have been no product recalls, withdrawals or seizures with respect to any products sold or delivered by Seller.

2.23   Full Disclosure. No representation or warranty made herein by Seller or the Representative or in any Schedule relating to any such representation or warranty contains any untrue statement of a material fact or omits to state any material fact required to be stated or necessary to make the statements contained therein not misleading in light of the circumstances in which they are made.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

3.1   Organization, Power and Authority. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New York, is duly qualified to conduct business in the State of New York, and has full power and authority to enter into and perform this Agreement and consummate the transactions contemplated hereby.

3.2   Authorization of Agreement.

(a)   This Agreement and the transactions contemplated hereby have been duly authorized by all necessary company action of Buyer to authorize Buyer to enter into this Agreement and to enable Buyer to carry out their terms, and this Agreement is binding on Buyer and enforceable in accordance with their terms.

(b)   Neither the execution nor the delivery of this Agreement nor the consummation of the transactions contemplated hereby is an event which, of itself or with the giving of notice or passage of time or both, constitutes the violation of any provision of, or results in the breach of or accelerates or permits the acceleration of the performance required by the term of any license or any applicable Law of any Governmental Authority having jurisdiction, the Certificate of Formation or Limited Liability Company Agreement of Buyer, or any agreement, indenture, mortgage, Lien, security agreement or lease to which Buyer is a party, or by which Buyer may be bound, or of any judgment, decree, writ, injunction, order or award of any arbitration panel, court or other Governmental Authority, applicable to Buyer, or results in the creation of any Lien upon any of the property or assets of Buyer, or terminates or cancels or results in the termination or cancellation of any such agreement. No notice to or consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority or other Person is required by Buyer with respect to Buyer's execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

3.3   Brokers or Finders. There are no, and will be no, Claims for brokerage commissions, finder's fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by Buyer or any of its Affiliates.

3.4   Lawsuits. There is no suit, action, arbitration, administrative or other proceeding pending or threatened affecting the ability of Buyer to enter into this Agreement, to consummate the transactions described herein, or to fulfill the obligations set forth herein.

{00302482.DOCX: 5}

## ARTICLE IV

## COVENANTS

    4.1    <u>Covenant Not to Compete; Confidentiality</u>.  In consideration of the promises herein contained and in consideration of the payments and other consideration to be provided to Seller (which are, ultimately, wholly owned by the Stockholders) as set forth in this Agreement, the Covered Persons (as defined below) do hereby agree for the benefit of Buyer as follows:

        (a)    <u>Restrictive Covenant</u>.  Each Covered Person shall not, directly or indirectly, engage in the Business and shall not directly or indirectly, own, manage, operate, control, be employed by, be a consultant to, participate in or have a financial interest in, or be connected in any manner (including as an employee, consultant, officer, director, owner or lender) with the ownership, management, operation or conduct of any entity engaged in the same or similar Business for the Restricted Period (as defined below), as set forth in this Agreement, anywhere within the Business Territory (as defined below).  In addition, during the Restricted Period, each Covered Person shall not:

        (i)    divert, take away, solicit, or accept business from any Person which was a client, customer or account of Seller or its Affiliates during the 12-month immediately prior to the Closing Date; or

        (ii)    solicit, attempt to solicit, induce for employment, hire, employ, train or supervise any Person which then is or has been employed by Buyer or any of its Affiliates during the 12-month immediately; <u>provided</u>, <u>however</u>, that the foregoing will not prevent Seller from conducting any general advertisements or internet solicitations for employment, not specifically targeted at such Persons, directly or through any agent (including placement and recruiting agencies); provided, further, that Seller shall not be deemed to have violated this <u>Section 4.1(a)(ii)</u> in the case any such Person directly contacts Seller following the Closing.

    Nothing in this Agreement shall, however, prohibit a Stockholder from (i) being employed by, hired as a consultant to, or otherwise provide services to, Buyer or any of its Affiliates, (ii) owning any securities of Buyer or any of its Affiliates or (iii) owning any securities of any publicly traded company conducting the Business.

    "<u>Covered Person</u>" means Seller and each Stockholder. "<u>Restricted Period</u>" means a period of three (3) years following the Closing Date. "<u>Business Territory</u>" means the continental United States.

        (b)    <u>Confidentiality</u>.  From and after the date hereof, each Covered Person agrees to, and agrees to cause each of such Person's members, partners, equityholders, Affiliates, directors, officers, employees, counsel, accountants, financial advisors, auditors, consultants and other representatives, to keep confidential any and all information or documents relating to Seller or any of its operations or business, and shall not disclose such information or documents to any Person or use such information or documents in any manner without the prior written consent of Buyer; <u>provided</u> that the foregoing shall not apply to any documents or information that: (i) is generally available to and known by the public through no fault of any Covered Person; or (ii) is lawfully acquired by a Covered Person from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If a Covered Person is compelled to disclose any information by judicial or administrative process or by other requirements of law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel to

{00302482.DOCX; 5}

disclose, provided that Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

(c)     Acknowledgment.  Each Covered Person acknowledges that the territory of the Business and Seller is the Business Territory set forth herein.  Each Covered Person further acknowledges that the restrictions contained in this Section 4.1 are reasonable, that damages in the event of breach will be difficult to ascertain, and that Buyer, in addition to any other remedies or rights which it may have, shall be entitled in any court of competent jurisdiction to specific performance of the rights set forth in this paragraph or injunctive relief against Seller or the Stockholders for any breach without the requirement of posting any bond or security. If, at the time of enforcement of this Section 4.1, a court shall hold that the duration or scope restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration or scope reasonable under such circumstances shall be substituted for the stated duration or scope and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period and scope permitted by Law. Each Covered Person agrees that the non-compete covenant is ancillary to an otherwise enforceable agreement, including the confidentiality covenant and the payment provision in Section 1.4. Each Covered Person and Buyer acknowledge and agree that the covenants in this Section 4.1 are necessary for the protection and preservation of the value and the goodwill of Buyer's business and prospects and are reasonable and valid in geographical and temporal scope and in all other respects.

(d)     Attorney's Fees and Court Costs.  If any legal action is instituted to enforce the provisions of this Agreement or any part hereof, the prevailing party shall be entitled to receive reasonable attorneys' fees and court costs.

(e)     Severability.  Should any part or provision contained in this Section 4.1 be rendered or declared invalid by reason of any existing or any subsequently enacted legislation or by any decree of a court of competent jurisdiction, the remaining provisions shall nevertheless remain in full force and effect to the maximum extent permitted by Law.  Any court having power to make such an adjudication is further authorized to modify any provisions hereof which may be deemed unduly restrictive to the end that such restrictions, as modified, shall be reasonable and valid.

4.2     Other Covenants.

(a)     Employees of Seller.  Seller shall terminate all of its employees effective as of immediately prior to the Closing.  For the avoidance of doubt, Seller shall retain all liabilities relating to, or arising out of, such terminations of employment whether under any policy or agreement or any applicable Law.

(b)     Access to Insurance.  Seller shall reasonably cooperate with Buyer for any Claims arising out of occurrences prior to the Closing to the extent such Claims are covered prior to the date hereof.  Seller shall not be required to maintain any insurance with respect to the Business, pay any additional premiums to continue such policies beyond the Closing Date.  Seller shall not have an obligation to renew or extend any existing policies after Closing.  Following the Closing, Seller shall reasonably cooperate with and assist Buyer at Buyer's cost in issuing notices of Claims under such insurance policies, presenting such Claims for payment and collecting insurance proceeds related hereto for the benefit of Buyer.

(c)     Remittance.  Promptly following the date of this Agreement, the parties shall establish a separate bank account and/or lockbox with the Buyer having the sole access and authorized signatory power to which is all funds otherwise sent to the Company will be deposited. Further, if Seller receives any refund or other amount which is an Acquired Asset or is otherwise properly

{00302482.DOCX; 5}

13



due and owing to Buyer in accordance with the terms of this Agreement, Seller shall promptly remit such amount to Buyer at the address set forth in Section 5.10. Notwithstanding anything to the contrary contained in this Agreement, the parties hereby acknowledge and agree that the Buyer shall take full control of the operation of the Company immediately following the execution of this Agreement (and not following the Closing). Therefore, the Buyer shall be entitled to all benefits derived from the Acquired Assets immediately after the execution of this Agreement and the parties shall reasonably cooperate to afford the Buyer all such benefits in accordance with the intent of the parties.

## ARTICLE V

### MISCELLANEOUS

5.1     Deliveries Subsequent to Closing; Accounts Receivable. Each party, upon the request of another party, shall deliver such additional documents, instruments and materials as may be reasonably necessary in order to carry out the provisions and purposes of this Agreement or to report the transaction to appropriate Governmental Authorities, including additional specific bills of sale, deeds and instruments of assignment.

5.2     Expenses. The parties to this Agreement shall, except as otherwise specifically provided herein, bear their respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives and counsel.

5.3     Seller and the Representative Indemnification. Seller and the Representative shall jointly and severally indemnify and hold Buyer and its members, partners, equityholders, Affiliates, directors, officers, employees, counsel, accountants, financial advisors, auditors, consultants or other representatives (together, the "Buyer Covered Persons") free and harmless from and against any actual, out-of-pocket losses, damages, costs and expenses including attorney's fees, costs of investigation, court costs, and costs of enforcement ("Covered Losses") incurred by any Buyer Covered Person as a result of:

(a)     any inaccuracy in or breach of any representation or warranty of Seller or the Representative contained in this Agreement,

(b)     any breach or default by Seller or the Representative under any of Seller's or the Representative's covenants or agreements under this Agreement, including under the restrictive covenants and confidentiality agreement set forth in Section 4.1,

(c)     any litigation set forth on Schedule 2.4, and/or

(d)     any Excluded Liability.

In the event Seller or the Representative owes any Buyer Covered Persons indemnification obligations for any of the foregoing matters, Seller and the Representative shall jointly and severally pay all Covered Losses incurred by Buyer as a result of any such indemnification. Buyer shall also have the right to offset the amount of Covered Losses against any amount payable by Buyer under this Agreement.

For purposes of calculating the amount of Covered Losses that are the subject matter of such Covered Losses for indemnification, the representations and warranties contained in this Agreement shall be deemed to have been made without any qualifications as to "materiality," "material liability" or

{00302482.DOCX; 5}

"material adverse effect". Any amounts payable under this Section 5.3 shall be treated by the parties hereto as adjustments to the Purchase Price.

5.4     Buyer Indemnification. Buyer shall indemnify and hold Seller, the Stockholders and any of Seller's Affiliates, directors, officers, employees, counsel, accountants, financial advisors, auditors, consultants or other representatives (together, the "Seller Covered Persons") free and harmless from and against any Covered Loss incurred by any Seller Covered Person as a result of:

(a)     any inaccuracy in or breach of any representation or warranty of Buyer contained in this Agreement,

(b)     any breach or default by Buyer under any of Buyer's covenants or agreements under this Agreement, and/or

(c)     all Assumed Liabilities.

In the event Buyer owes any Seller Covered Persons indemnification obligations for any of the foregoing matters, Buyer shall pay all Covered Losses incurred by Seller as a result of any such indemnification matter.

5.5     Limitations on Indemnification. Except as set forth herein, there shall be no limitations as regards any Person's entitlement to indemnification with respect to the representations and warranties set forth in Sections 2.1, 2.2(a), 2.3, 2.5, 2.9, 2.11, 2.17, 3.1, 3.2(a) or 3.3 (the "Excluded Sections"). Except for the Excluded Sections, the Buyer Covered Persons shall not be entitled to indemnification under Section 5.3(a) unless and until the aggregate amount of liability for Covered Losses thereunder exceeds $100,000 (the "Basket") at which point Seller and the Representative will be obligated to indemnify the Buyer Covered Persons for the entire amount of all Covered Losses from the first dollar up to the Purchase Price (the "Indemnification Cap"), it being understood that the Basket and the Indemnification Cap do not apply to the Excluded Sections. Notwithstanding the foregoing, in no event shall Seller and the Representative be liable for the aggregate amount of any Covered Losses in excess of the amounts actually received or to be received hereunder.

5.6     Survival. The representations, warranties, covenants, indemnification obligations and all other agreements of the parties set forth in this Agreement (i) shall be deemed to have been made on and as of the Closing Date, (ii) are material and are being relied upon by the parties hereto, and (iii) except as set forth in this Section 5.6, shall survive for eighteen (18) months following the Closing; provided, however, that:

(a)     any Covered Losses asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the Indemnified Party to the Indemnifying Party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved,

(b)     the Excluded Sections shall survive indefinitely,

(c)     the covenants and agreements set forth in this Agreement that contemplate compliance or performance after the Closing shall survive the Closing and shall continue until all obligations with respect thereto shall have been performed or satisfied or shall have been terminated in accordance with their terms, including the restrictive covenants set forth in Section 4.1, and

{00302482.DOCX; 5}

15



(d)      notwithstanding anything herein to the contrary, to the extent that any representation, warranty, covenant or agreement of a party set forth herein was fraudulent, any Claim with respect thereto shall survive indefinitely.

5.7      Other Indemnification Matters.  The party making a claim under Section 5.3 or 5.4 is referred to as the "Indemnified Party," and the party against whom such claims are asserted under Section 5.3 or 5.4 is referred to as the "Indemnifying Party."

(a)      The Indemnified Party shall use commercially reasonable efforts to seek full recovery under all insurance policies covering any indemnifiable Covered Losses to the same extent as the Indemnified Party would if such Covered Losses were not subject to indemnification under this Agreement.  The amount payable in respect of any Covered Losses shall be calculated net of any insurance proceeds.

(b)      Each party shall take, and shall cause its Affiliates to take, all commercially reasonable efforts to mitigate upon and after becoming aware of any event which could reasonably be expected to give rise to a claim for indemnification hereunder.

(c)      Buyer acknowledges and agrees that, except for fraud, its sole and exclusive remedy with respect to any and all Claims relating to this Agreement and the transactions contemplated hereby, shall be pursuant to the indemnification provisions set forth in Section 5.3 through this Section 5.7.

5.8      Applicable Law, Jurisdiction and Venue.  This Agreement shall in all respects be construed in accordance with and governed by the Laws of the State of New York, without regard to the conflicts of Laws provisions therein.  The parties hereto further agree and consent that jurisdiction and venue for any action brought related to or arising out of this Agreement shall be the state courts or the federal courts located in New York, New York; provided that the covenants in Section 4.1 may be enforced by any court of competent jurisdiction.

5.9      WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

5.10      Notices.  Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, sent by certified, registered or express mail, postage prepaid, or sent by e-mail.  Any such notice shall be deemed given when so delivered personally, sent by e-mail or, if mailed, five days after the date of deposit in the United States mail, and shall be addressed as follows:

If to Buyer:                Meer Enterprises LLC
                            c/o Luvente
                            22 West 48th Street, Suite 1201

{00302482.DOCX; 5}



New York, New York 10036
Attention: Daniel Dabakarov
E-mail: daniel@luvente.com

If to Seller
or the Representative:            D.C. Group, Inc.
                                 c/o Unique Settings of New York
                                 3100 47th Avenue, 2nd Floor
                                 Long Island City, New York 11101
                                 Attention: Anda Ozan Ekmel
                                 E-mail: melanda@usofny.com

or to the attention of such other Persons or to such other addresses as may be given by due notice.

     5.11   <u>Successors and Assigns</u>. Buyer may not assign this Agreement without receiving the prior written consent of Seller or its permitted assignees, except that Buyer may assign its rights and obligations to any of its Affiliates, and such rights shall be enforceable by said assigns, but no assignment shall relieve Buyer of any liability hereunder. Neither Seller nor the Representative may assign this Agreement without receiving the prior written consent of Buyer or its permitted assignees; provided, however, that Seller may assign the post-Closing consideration to the Stockholders.

     5.12   <u>Binding Effect</u>. Subject to <u>Section 5.11</u>, this Agreement shall be binding upon and inure to the benefit of each party hereto, its successors and assigns.

     5.13   <u>Usage</u>. Unless the express context otherwise requires: (a) all pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require; (b) all terms defined in this Agreement in their singular or plural forms have correlative meanings when used herein in their plural or singular forms respectively; (c) unless otherwise expressly provided, the words "include," "includes" and "including" do not limit the preceding words or terms and shall be deemed to be followed by the words "without limitation"; (d) references herein to any Contract mean such Contract as amended, supplemented or modified (including any waiver thereto) in accordance with the terms thereof, except that with respect to any Contract listed on any schedule hereto, all such amendments, supplements or modifications must also be listed on such schedule; (e) the words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (f) the terms "Dollars" and "$" mean United States Dollars; (g) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (h) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (h) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (i) references herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity; (j) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; and (k) references herein to any Law or any license mean such Law or license as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time.

     5.14   <u>Certain Defined Terms</u>. Except as otherwise provided herein, all capitalized terms used herein shall have the meanings assigned to them below.



(a)     "Accounts Receivable" means Seller's accounts or notes receivable (including any security or collateral for such accounts receivable and including both billed and unbilled work, prior to any write-off, allowance or reserve for doubtful accounts).

(b)     "Acquired Assets" has the meaning specified in Section 1.1.

(c)     "Affiliate" means, with respect to any Person, any other Person controlling, controlled by or under common control with, or the parents, spouse, lineal descendants or beneficiaries of, such Person.

(d)     "Agreement" has the meaning specified in the Preamble.

(e)     "Assumed Contracts" has the meaning specified in Section 1.1(d).

(f)     "Assumed Liabilities" has the meaning specified in Section 1.3.

(g)     "Basket" has the meaning specified in Section 5.5.

(h)     "Business" has the meaning specified in the Recitals.

(i)     "Business Territory" has the meaning specified in Section 4.1.

(j)     "Buyer" has the meaning specified in the Preamble.

(k)     "Buyer Covered Persons" has the meaning specified in Section 5.3.

(l)     "Claim" shall mean any and all claims, demands, causes of actions, suits, proceedings, administrative proceedings, investigations, losses, judgments, decrees, debts, damages, liabilities, court costs, attorney fees and any other expenses incurred, as sustained by or against the Business.

(m)    "Closing" has the meaning specified in Section 1.6.

(n)     "Closing Date" has the meaning specified in Section 1.6.

(o)     "Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

(p)     "Contract" means any contract, lease, sublease, license, indenture, bond, debenture, note, mortgage, guarantee, instrument, agreement, deed of trust, conditional sales contract or other legally binding arrangement, together with modifications and amendments thereto (in each case, whether written or oral).

(q)     "Covered Losses" has the meaning specified in Section 5.3.

(r)     "Covered Person" has the meaning specified in Section 4.1.

(s)     "Disclosure Schedules" has the meaning specified in the introductory paragraph of Article II.

(t)     "Environmental Law" means any applicable Law, and any order by a Governmental Authority or binding agreement with any Governmental Authority: (i) relating to pollution

{00302482.DOCX; 5}

(or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (ii) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials.

(u)    "Excluded Assets" has the meaning specified in Section 1.2.

(v)    "Excluded Liabilities" has the meaning specified in Section 1.3.

(w)    "Excluded Sections" has the meaning specified in Section 5.5.

(x)    "Existing Real Property Lease" has the meaning specified in Section 2.12.

(y)    "Financial Statements" has the meaning specified in Section 2.8.

(z)    "Governmental Authority" means any government (including any United States or foreign federal, state, provincial, cantonal, municipal or county government), any political subdivision thereof and any governmental, administrative, ministerial, regulatory, central bank, self-regulatory, quasi-governmental, taxing, executive or legislative department, commission, body, agency, authority or instrumentality of any thereof.

(aa)    "Hazardous Materials" means: (i) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (ii) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls..

(bb)    "Indemnification Cap" has the meaning specified in Section 5.5.

(cc)    "Indemnified Party" has the meaning specified in Section 5.7.

(dd)    "Indemnifying Party" has the meaning specified in Section 5.7.

(ee)    "Intellectual Property" has the meaning specified in Section 2.7(b).

(ff)    "Inventory" has the meaning specified in Section 1.1(b).

(gg)    "Knowledge of Seller" means the actual knowledge of Ekmel after due inquiry.

(hh)    "Law" means any law (including common law), statute, ordinance, code, regulation, rule, order, decision, judgment, writ injunction, decrees, award or other requirement or determination of, or any Contract with, any Governmental Authority.

(ii)    "Leased Real Property" has the meaning specified in Section 2.12.

(jj)    "Liens" has the meaning specified in Section 2.3.

(kk)    "Nonassignable Asset" has the meaning specified in Section 1.10.

{00302482.DOCX; 5}

19

(ll)    "Pay-Off Letter" has the meaning specified in Section 1.4(b).

(mm)    "Permitted Liens" means:  (i) liens for taxes not yet due and payable or being contested in good faith by appropriate procedures; (ii) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; (iii) easements, rights of way, zoning ordinances and other similar encumbrances affecting Leased Real Property; (iv) liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business; and (v) other immaterial imperfections of title or Liens.

(nn)    "Person" means any natural person, business, corporation, company, partnership, association, limited liability company, limited partnership, limited liability partnership, joint venture, business enterprise, trust or other legal entity, including any Governmental Authority.

(oo)    "Purchase Price" has the meaning specified in Section 1.4.

(pp)    "Representative" has the meaning specified in the Preamble.

(qq)    "Restricted Period" has the meaning specified in Section 4.1.

(rr)    "Seller" has the meaning specified in the Preamble.

(ss)    "Seller Covered Persons" has the meaning specified in Section 5.4.

(tt)    "Stockholders" has the meaning specified in the Preamble.

5.15    Counterparts.  This Agreement may be signed in counterparts, none of which shall be deemed to be binding unless and until all parties have signed this Agreement.  Facsimile or portable document format (PDF) signatures shall be treated as original signatures for all purposes hereunder.

5.16    Severability.  Should any part of any provision contained in this Agreement be rendered or declared invalid by reason of any existing or subsequently enacted legislation or by any decree of a court of competent jurisdiction, the remaining provisions shall nevertheless remain in full force and effect to the maximum extent permitted by Law; provided that this Section 5.16 is not intended to supersede the provisions of Section 4.1(e).

5.17    Entire Agreement.  This Agreement including all schedules and exhibits hereto, constitutes the entire agreement between the parties and supersedes any and all prior agreements between them relating to the subject matter hereof and may not be amended except in writing signed by the party to be bound.

5.18    The Representative.

(a)    Seller and Stockholders hereby irrevocably appoint the Representative as the sole agent of Seller and Stockholders to act on behalf of such Person regarding any matter relating to or arising under this Agreement, including for the purposes of: (i) receiving any payments due from Buyer that are required under the terms of this Agreement to be paid to Seller and, where applicable, distributing such payments to Seller; (ii) taking any action on behalf of Seller, Stockholders or any individual Stockholder that may be necessary or desirable, as determined by the Representative in its sole discretion, in connection with the indemnification provisions set forth in Section 5.3 or any other

{00302482.DOCX; 5}

provision in this Agreement in accordance with its terms; (iii) accepting notices on behalf of Seller, Stockholders or any individual Stockholder in accordance with Section 5.3; (iv) executing and delivering, on behalf of Seller, Stockholders or any individual Stockholder, any notices, documents or certificates to be executed by Seller, Stockholders or any individual Stockholder in connection with this Agreement; and (v) granting any consent or approval on behalf of Seller, Stockholders or any individual Stockholder under this Agreement. As the representative of Seller, Stockholders or any individual Stockholder under this Agreement, the Representative shall act as the agent for Seller and each Stockholder and shall have authority to bind Seller and each Stockholder with respect to all matters arising under or relating to this Agreement. All of the immunities, powers and rights granted to the Representative under this Agreement shall survive the Closing or any termination of this Agreement. The grant of authority provided for herein is coupled with an interest and shall be irrevocable and survive the death, incompetency, bankruptcy, dissolution, winding up or liquidation of Seller or any Stockholders.

(b)    Buyer may rely exclusively, without independent verification or investigation, upon all decisions, communications or writings made, given or executed by the Representative in connection with this Agreement. Buyer is entitled to deal exclusively with the Representative on all matters arising under or relating to this Agreement and the contemplated transaction. Any action taken or not taken or decisions, communications or writings made, given or executed by the Representative, for or on behalf of Seller or any Stockholder, shall be deemed an action taken or not taken or decisions, communications or writings made, given or executed by Seller or each Stockholder. Any notice or communication delivered by Buyer to the Representative shall be deemed to have been delivered to Seller and each Stockholder. Buyer shall be entitled to disregard any decisions, communications or writings made, given or executed by Seller or any Stockholder in connection with this Agreement and the contemplated transaction unless the same is made, given or by the Representative. Notwithstanding anything to the contrary set forth herein, Buyer shall not be liable for any loss to any Person, including Seller, any Stockholder or Representative, for any action taken or not taken by the Representative or for any act or omission taken or not taken in reliance upon the actions taken or not taken or decisions, communications or writings made, given or executed by the Representative, including any failure of the Representative to distribute, or to distribute or sub divide in the correct amounts, any payments made to the Representative by Buyer for distribution to Seller or any Stockholder, among Seller and Stockholders or any other Person; it being understood that once Buyer has made such a payment to the Representative for distribution to Seller or any Stockholder, among Seller and Stockholders or to such other Person, such payment shall constitute a complete discharge of the relevant payment obligation of Buyer.

*[Remainder of this page intentionally left blank]*

{00302482.DOCX; 5}

21



IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first written above.

**BUYER:**

Meer Enterprises LLC

By: _____

Name: Daniel Dabakarov

Title: Member

**SELLER:**

D.C. Group, Inc.

By: _____
Name:
Title:

**REPRESENTATIVE:**

_____
Anda Ozan Ekmel

# EXHIBIT B

D.C. Group, Inc.

CORPORATE RESOLUTION TO SELL

The undersigned certify to as follows:

1. We are the sole shareholders of D.C. Group, Inc. (hereinafter "the Company").

2. The Certificate of Incorporations and By-Laws, together with all amendments thereto, as in effect on the date hereof, is annexed hereto as Exhibit 1.

3. The Shareholders hereby unanimously agree and resolve that Company should enter into Asset Purchase Agreement dated as of May 20, 2016 (the "Asset Purchase Agreement"), by and among D.C. Group, Inc. and Meer Enterprises LLC.

4. It is further resolved, that any and all acts authorized pursuant to these Resolutions are hereby ratified and approved by the Company, that these Resolutions shall remain in full force and effect and that Meer Enterprises LLC may rely on these Resolutions until such time as written notice of their revocation shall have been received by Meer Enterprises LLC. Any such notice shall not affect any of the Company's agreements or commitments in effect at the time said notice is given.

5. The Shareholders hereby unanimously agree that David Kocak and Anda Ozan Ekmel, jointly or separate, are authorized to execute and deliver all such instruments and documents in the name and on behalf of the Company, including, without limitation, applications, statements, notes, drafts, security agreements, hypothecation agreements, financial statements, financing statements, mortgages, pledges, subordination agreements, letter of credit agreements, acceptance agreements, assignments, etc, in such form or forms, and containing such terms, provisions and conditions, as may

be required, and to perform any and all other acts and to pay all such fees and expenses as in the David Kocak's and/or Anda Ozan Ekmel's judgment shall be necessary, proper or advisable in order fully to carry out the intent and to accomplish the purpose hereof.

6. We further certify that this transaction by the Company will not violate any provision of the Certificate of Incorporations and By-Laws.

IN WITNESS HERETO, I attest to the truth and accuracy of the above representations this 17th day of June, 2016.

_David Kocak_                            _Anda Ozan Ekmel_

STATE OF NEW YORK, COUNTY OF _New York_

On the 17 day of June, 2016, before me, the undersigned personally appeared _David Kocak and Anda Ozan Ekmel_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that ~~he/she/~~ they executed the same in ~~his/her~~/their capacity(ies), and that by ~~his/her~~/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Notary Public_

Kara Kessler
Notary Public, State of New York
Registration No. 01KE4906580
Qualified in Kings County
Certificate on File in New York County
Commission Expires February 16, 2018

STATE OF NEW YORK, COUNTY OF _____

On the ___ day of June, 2016, before me, the undersigned personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/ they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public